IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TAMARA S. FRAZIER,             )
                                      )
           Plaintiff,       )    Case No. 1:20-cv-6725
      v.                      )
                                      )    Honorable Harry D. Leinenweber
EQUIFAX INFORMATION SERVICES,   )
LLC,                           )
                                      )
           Defendant.    )
                                      )

---

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

On the brief:

Daniel Zemel, Esq.
Zemel Law LLC
660 Broadway
Paterson, New Jersey 07514
T: 862-227-3106
dz@zemellawllc.com

# Table of Contents

I.     PRELIMINARY STATEMENT ........................................................... 1

II.    FACTS OF THE CASE ..................................................................... 1

III.   ARGUMENT ................................................................................. 3

   A.   Plaintiff's Credit Reports Were Not Accurate ................................... 3

      1.   The Credit Reports Are Patently Inaccurate on Their Face ............................ 3

      2.   Equifax Cannot Rely on the Contradictory Testimony From Mr. Holmes to Establish

      Accuracy *As A Matter of Law* ..................................................... 6

      3.   Judge Feinerman's Decision Did Not Address the Erroneous Historical Delinquencies

      Published by Equifax in This Case ................................................. 7

   B.   Frazier Suffered Financial and Emotional Damages From Equifax's Reporting ............ 10

      1.   Financial Damages ............................................................. 10

      2.   Emotional Damages ............................................................. 13

   C.   Defendant Fails to Carry Its Burden on the Reasonableness of its Investigation ............ 16

      1.   Equifax Knew the Reporting was Erroneous ...................................... 17

      2.   DMI Alerted Equifax To Remove the Erroneous Lates; Equifax Disregarded DMI ... 18

      3.   Equifax's Sole Reliance on the ACDV Exchange Was Not Reasonable ................... 19

   D.   Questions of Fact Remain on the Issue of Willful Violation of the FCRA ...................... 22

V.     CONCLUSION ............................................................................. 25

**Cases**

Alexander v. Casino Queen, Inc., 739 F.3d 972 (7th Cir. 2014) ..................................... 3

Allen v. Experian Info. Solutions, Inc., 2006 U.S. Dist. LEXIS 29049 (S.D.Ill. May 12, 2006). 13

Am. Arms Int'l v. Herbert, 563 F.3d 78 (4th Cir. 2009) .............................................. 24

Bibbs v. Trans Union LLC, 43 F.4th 331 (3d Cir. 2022) ....................................... 5, 8, 9

Bryant v. TRW, Inc., 689 F.2d 72 (6th Cir. 1982).................................................... 20

Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151 (11th Cir. 1991) ........................... 10

Chaitoff v. Experian Info. Sols., Inc., 2021 U.S. Dist. LEXIS 90281 (N.D. Ill. May 12, 2021).. 21

Collins v. Diversified Consultants Inc., 2017 U.S. Dist. LEXIS 35487 (D. Colo. Feb. 1, 2017). 22

Collins v. Experian Information Solutions, Inc., 775 F.3d 1330 (11th Cir. 2015) ...................... 20

Connor v. JP Morgan Chase Bank, N.A., 2016 U.S. Dist. LEXIS 66976 (N.D.Ill. Mar. 22, 2016)
................................................................................................. 9

Crabill v. Trans Union, 259 F.3d 662 (7th Cir. 2001) ................................................ 16

Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp., 635 F.3d 1373 (Fed. Cir.
2011) ......................................................................................... 13

Cushman v. Trans Union Corp., 115 F.3d 220 (3d Cir. 1997) ........................................ 16, 20

Dennis v. BEH-1, LLC, 520 F.3d 1066 (9th Cir. 2008) .............................................. 20

Folkerts v. Seterus, Inc., 2019 U.S. Dist. LEXIS 42347 (N.D. Ill. Mar. 15, 2019)..................... 22

Frazier v. Dovenmuehle Mortgage, Inc., 2022 U.S. Dist. LEXIS 146750 (N.D. Ill. Aug. 17,
2022) ....................................................................................... 5, 7

Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147 (9th Cir. 2009)..................................... 3

Gross v. Private Nat' Mortg. Acceptance Co., LLC, 512 F. Supp. 3d 423 (E.D.N.Y. 2021)......... 8

Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329 (9th Cir. 1995)................................. 13

Henson v. CSC Credit Servs., 29 F.3d 280 (7th Cir. 1994) ..................................................... 16, 20

Hinton v. USA Funds, 2005 U.S. Dist. LEXIS 6275 (N.D. Ill. Mar. 30, 2005) ...................... 4, 16

Hoover v. Switlik Parachute Co., 663 F.2d 964 (9th Cir. 1981) .................................................... 3

Losch v. Nationstar Mortg. LLC, 995 F.3d 937 (11th Cir. 2021) ......................................... 16, 20

Paz v. Portfolio Recovery Assocs., LLC, 2016 U.S. Dist. LEXIS 50149 (N.D. Ill. Apr. 14, 2016)

.................................................................................................................................................. 14

Philbin v. Trans Union Corp., 101 F.3d 957 (3d Cir. 1996) ....................................................... 10

Pinner v. Schmidt, 805 F.2d 1258 (5th Cir. 1986) ...................................................................... 20

Ruffin-Thompkins v. Experian Info. Sys., Inc., 2003 U.S. Dist. LEXIS 23647 (N.D. Ill. Dec. 31,

2003), aff'd, 422 F.3d 603 (7th Cir. 2005) ....................................................................... 10, 13

Sarver v. Experian Info. Sols., 390 F.3d 969 (7th Cir. 2004) ................................................ 13, 16

Sepulvado v. CSC Credit Servs., Inc., 158 F.3d 890 (5th Cir. 1998) ......................................... 3, 6

Stewart v. Credit Bureau, Inc., 734 F.2d 47 (D.C.C. 1984) ........................................................ 10

Taylor v. Screening Reports, Inc., 2015 U.S. Dist. LEXIS 86262 (N.D. Ill. July 2, 2015) .......... 10

Twomey v. Ocwen Loan Servicing, LLC, 2016 U.S. Dist. LEXIS 111307 (N.D. Ill. Aug. 22,

2016) ........................................................................................................................................ 6

Vollmert v. Wis. DOT, 197 F.3d 293 (7th Cir. 1999) ................................................................. 12

## I.     **PRELIMINARY STATEMENT**

This case presents many simple questions which dictate the outcome. Does a credit report mean what it says? Can Equifax ("Defendant") ignore credit errors which it knows are inaccurate? Can Equifax rely on its data furnisher to avoid liability, all the while ignoring the data furnisher's instruction to remove the error? Can a jury consider Equifax's conduct reckless when Equifax disregards: its own knowledge of an error, the correction attempts of a data furnisher, and multiple disputes from a consumer? Because these questions are rhetorical, Equifax's Motion must be denied.

Tamara Frazier's Equifax credit report conveyed that Ms. Frazier was 90+ days past due on her obligation to Dovenmuehle Mortgage, Inc. ("DMI") in each of the following months: December 2018, January, June, August, October, November 2019, and July 2020. But Frazier, Equifax, and DMI all agree she was not late during these months. Thus, inaccuracy is obvious.

Equifax's investigation of the error demonstrated negligent and reckless disregard for reporting accuracy. Frazier's disputes were crystal clear. Equifax knew the information could not be accurate. And DMI attempted to advise Equifax to fix the error. Nonetheless, Equifax refused to correct the error. As a result, Frazier's mortgage application was subject to more rigorous lending criteria, and Frazier was denied her mortgage. Frazier was left distraught by the denial because it placed her mother at risk of being homeless. Significant factual questions remain, and the motion must be denied.

## II.     **FACTS OF THE CASE**

Ms. Frazier ("Plaintiff") alleges that Defendant was reporting a credit entry ("account" or "tradeline"), on her Equifax credit reports that included inaccurate information. Ms. Frazier specifically alleged that both Credit Reporting Agencies ("CRAs") were reporting Ms. Frazier as

1

late in 2018 and 2019 or currently delinquent on a debt which Plaintiff did not owe. [ECF 1], ¶¶ 10-12.

The account in question was opened in 2007 when Ms. Frazier obtained a mortgage. Defendant's Statement of Material Facts ("DSOMF"), [ECF 54], ¶ 12. In January 2016, the mortgage was included in a short sale which brought Plaintiff's account to a close with no continuing obligation. DSOMF, ¶ 15. Nonetheless, in 2019, Ms. Frazier noticed that the account was reporting her as delinquent on her Equifax reports. She began disputing the account to Equifax. When the credit reporting agencies transmit the dispute to Defendant, it is sent in an ACDV form, along with a copy of the dispute letter. DSOMF, ¶ 7.

On July 2, 2020, Ms. Frazier submitted a dispute to Equifax. Ms. Frazier alerted Equifax that the account was "displaying the incorrect status" and that it was portraying her as "past due." DSOMF, ¶ 42. Equifax assigned the dispute a "Dispute Code" of "007" meaning "disputes present/previous account status/payment rating/account history," and forwarded the dispute to DMI. DSOMF, ¶ 43. Under "Account Status," Equifax was reporting a status of "80", which means "Account 90 days past the due date." EQX 1436 (Def. Exhibit Q). There was no "Pay-Rate" information, or data on the payment rating. *Id.* DMI updated the reporting to show an account status of "13" (or "closed"), with a pay-rate of "3", which means over 90 days delinquent. *Id.* Despite this, Equifax's dispute results show a very different picture. The status is shown as past due 90 days, despite the closed status of the account, and Equifax clearly shows an account history with status codes reflecting 90 days late in the following months: December 2018, January 2019, June 2019, August 2019, and October 2019. EQX 1448 (Def. Exhibit R).

In August 2020, Ms. Frazier applied for a mortgage loan with Oak Leaf Community Mortgage through David Holmes a senior mortgage loan originator. Plaintiff's Statement of

Facts ("PSOMF"), ¶ 16. On September 10, 2020, after pulling Ms. Frazier's credit report, Mr. Holmes advised that she would not be able to obtain a loan in part due to the DMI tradeline reporting her as late after the short sale. *Id*. As a result, Plaintiff was unable to close on her home and refrained from re-applying for a mortgage. On September 15, 2020, Ms. Frazier again sent a dispute letter stating that the "account has been closed and satisfied since 2016. The late payments in 2019 and 2020 aren't correct." DSOMF, ¶ 48. In response, Equifax again reported delinquent statuses for the above-mentioned months, and also included July 2020 as the latest month with a delinquency.

### III. <u>ARGUMENT</u>

**A. Plaintiff's Credit Reports Were Not Accurate**

1. <u>The Credit Reports Are Patently Inaccurate on Their Face</u>

An item on a credit report can be "'incomplete or inaccurate' within the meaning of the FCRA 'because it is patently incorrect, *or* because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.'" *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009) (*citing Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895 (5th Cir. 1998)) (emphasis added). Here, it is obvious that the report is patently inaccurate, and all parties agree that Plaintiff was not late after 2016 despite the late payments showing on the credit report. Deposition of David Fagan ("Fagan Dep."), p. 17:20-22 ("According to Dovenmuehle, she should not be late. She is not late. It would be inaccurate, according to Dovenmuehle.") (Plaintiff's Exhibit 1); Deposition of Lisa Willis ("Willis Dep."), p. 42: 24-43:20 (Plaintiff's Exhibit 4).[1]

---

[1] Mr. Fagan's deposition can be used in this case, as he would be a valid witness at trial. *Alexander v. Casino Queen, Inc.,* 739 F.3d 972, 978-79 (7th Cir. 2014); *Hoover v. Switlik Parachute Co*., 663 F.2d 964, 966 (9th Cir. 1981) (depositions can meet Rule 56's requirements when they are "made on personal knowledge and set forth facts that were admissible in evidence" and parties may file affidavits in support of summary judgment without providing

Images of Plaintiff's credit reports are necessary to drive this point home. Plaintiff's Exhibit 2. Image 1 is snippet of the DMI tradeline on the credit report pulled by Mutual Federal Bank in connection with Plaintiff's mortgage application in September 2020. DSOMF, ¶¶ 53 and 54. The credit report provides information received from Equifax (note the bold EF symbol under source). DSOMF, ¶ 55.

IMAGE 1

| 023 | | | | | | 30 | 60 | 90+ | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ECOA / WHOSE<br>B / B | DMI<br>3101423331832 | ACCT TYPE<br>MTG | REPORTED<br>07/20 | HI CREDIT<br>$75516 | PAYMENT<br>$0 | 0 | 1 | 7 | SETTLED | | |
| SOURCE<br>XP/TU/**EF** | | TERM<br>UNK | OPENED<br>02/07 | BALANCE<br>$0 | PAST DUE<br>$0 | | 12/15 | 7/20<br>11/19<br>10/19<br>8/19<br>6/19<br>1/19<br>12/18 | MO REV<br>69 | LAST LATE<br>07/20 | DLA<br>10/15 |
| | CONSUMER DISPUTES - REINVESTIGATION IN PROGRESS; ACCOUNT PAID FOR LESS THAN FULL BALANCE | | | | | | | | | | |

Image 1 clearly states that Ms. Frazier was 90+ days late during each of December 2018, January, June, August, October, November 2019, and July 2020 (the "Erroneous 2018-2020 Lates"). Expert Report of Evan Hendricks ("Hendricks Report"), p. 1 (Plaintiff's Exhibit 14); Deposition of Evan Hendricks ("Hendricks Dep."), p. 58:9-15 ("Equifax was inaccurately reporting that plaintiff was delinquent on certain months after this [debt] was paid and settled when she was not delinquent.") (Plaintiff's Exhibit 15); Deposition of Alexander King ("King Dep."), p. 106:18-108:12 ("It indicates that a payment that was due on December of 2018 went 90 days or more past the due date.") (Plaintiff's Exhibit 17). Yet, there is no dispute that Plaintiff satisfied her account with DMI in January 14, 2016. DSOMF, ¶ 15. Therefore, Plaintiff could not have been late in any of the listed months of 2018, 2019, or 2020 and the report is patently false.

---

notice or an opportunity to cross-examine the affiant). DMI was identified as a witness within Plaintiff's Interrogatory Responses. Def. Ex. W, Rog Response No. 7.

*See Hinton v. USA Funds*, 2005 U.S. Dist. LEXIS 6275, at *6 (N.D. Ill. Mar. 30, 2005) (reporting delinquent historical payments after debt paid off is inaccurate).

Although it boggles the mind, Equifax argues that this report is accurate because the report is "holistically read" to mean that Plaintiff paid off her debt in January 2016. [ECF 53], p. 11. Never mind that there is no reference to 1/2016 as a date of satisfaction of the loan anywhere on the credit report issued; Equifax argues that because the tradeline reports as ACCOUNT PAID FOR LESS THAN FULL BALANCE, and because the Date of Last Activity (which is not specified or explained in the report) is listed as 10/15 (a date before the short sale), anybody reading this report, must disregard the historical late months specifically delineated and conclude the account was closed and satisfied in 1/2016.[2] And further, Equifax believes the reader *must* disregard both the LAST LATE data field listing 7/20 and the 90+ data field. To be clear, Equifax is specifically articulating that the Court should disregard the specific and patently obvious dates and data fields within the credit report, so that the Court can conclude this reporting is in fact accurate and reach a conclusion that is not written in the report. While obviously nonsensical, Equifax's "holistic approach" of "viewing the report in its entirety" is only the standard when the claim is that the report is materially misleading but patently accurate. *See, e.g.*, *Bibbs v. Trans Union LLC*, 43 F.4th 331, 342 (3d Cir. 2022). Here, the report is patently inaccurate, and there is no need to delve into whether the report should be read as a whole because the account is not vague. It is undisputed that Plaintiff was not late during the months in 2018 through 2020. The report is patently inaccurate.

---

[2] Equifax also reaches this conclusion by citing to *Frazier v. Dovenmuehle Mortgage, Inc*., 2022 U.S. Dist. LEXIS 146750 (N.D. Ill. Aug. 17, 2022). However, the *Frazier* decision relied on the document provided by DMI to Equifax (the ACDV), which indisputably listed the 1/2016 in its correspondence. *Infra* fn 4; Exhibits 5, 6, and 8. The ACDV is not the credit report issued by Equifax to Frazier's prospective creditor. The credit report is Exhibit 2. The credit report pulled by Frazier's creditor did not list the 1/16 date anywhere. See Image 1.

2. Equifax Cannot Rely on the Contradictory Testimony From Mr. Holmes to Establish Accuracy *as A Matter of Law*

David Holmes is the Senior Mortgage Loan Originator that pulled Ms. Frazier's credit in connection with her mortgage application. After pulling Ms. Frazier's report, Mr. Holmes informed Ms. Frazier that she would not be able to proceed with the loan because the credit report shows her as recently late on her DMI account. Deposition of Tamara Frazier ("Frazier Dep."), p. 16:13-17:23 (Plaintiff's Exhibit 3); PSOMF, ¶ 22 ("**the wrong information for DMI mortgage showing late payments in 2018 when you didn't even own the home after 2016 is hurting the approval process**."). And Mr. Holmes also confirmed that these late payments presented an issue with getting approved under the FHA mortgage guidelines. Deposition of David Holmes ("Holmes Dep."), p. 55:9-12 (Exhibit 20).

Equifax argues that because Mr. Holmes testified that he *personally* understood that the account had been closed in 2016 and that it was 90 days late *at that time*, despite Mr. Holmes clear statement this erroneous reporting would prevent Ms. Frazier from obtaining a mortgage, Mr. Holmes was not himself misled. But Equifax misapplies the proper standard. As argued above, it is irrelevant that Mr. Holmes understand that Plaintiff was not late, because the report is patently inaccurate. Patent inaccuracy does not require an inquiry into whether the report is also misleading to prospective creditors. The report is so patently inaccurate that Mr. Holmes admits that he knows its inaccurate and it is blatantly showing "the wrong information." In essence, Equifax is arguing that the report is so obviously inaccurate that there is no liability. But the FCRA calls for maximum possible accuracy. 15 U.S.C. § 1681e(b).

Even so, Mr. Holmes' personal understanding of the credit report would not prevent the report from being misleading in addition to patently inaccurate. A credit entry can be inaccurate when it "is misleading in such a way and to such an extent that it can be expected to adversely

6

affect credit decisions." *Twomey v. Ocwen Loan Servicing, LLC,* 2016 U.S. Dist. LEXIS 111307, at *11 (N.D. Ill. Aug. 22, 2016) (citing *Sepulvado*, 158 F.3d at 895). Under this alternate standard, Mr. Holmes' personal opinion is, again, irrelevant. Critically, Mr. Holmes' emails show that the late monthly statuses were problematic and an obstacle to Plaintiff obtaining a loan, regardless of his personal understanding. This precisely presents a situation where an error adversely affected credit decisions. As Mr. Holmes confirmed when he testified that the late payments, even though "he understood them to be inaccurate," ***did*** prevent Frazier from meeting the FHA guidelines for a mortgage loan. Holmes Dep., p. 55:9-12; *see also* Expert Report of Alexander King ("King Report"), p. 3 (Plaintiff's Exhibit 16). Thus, the erroneous lates can be expected to adversely affect credit decisions; meeting the materially misleading standard.[3]

   3. <u>Judge Feinerman's Decision Did Not Address the Erroneous Historical Delinquencies Published by Equifax in This Case</u>

Ms. Frazier's theory in this case clearly laid out Equifax's liability for reporting the Erroneous 2018-2020 Lates. Complaint [ECF 1], ¶¶ 10 and 11. Instead of focusing on these historical inaccuracies, Equifax reframes Frazier's argument as a complaint that her loan was inaccurately reporting as *currently* late in September 2020—at the time of the broker's credit pull. After shifting Frazier's Complaint, Equifax proceeds to make comparisons with Judge Feinerman's decision and others.

*Frazier v. Dovenmuehle Mortg., Inc.* did not address the issue presented here. There, Judge Feinerman focused solely on DMI's credit reporting within the ACDV form, and more specifically whether the "Pay Rate" code of "3" was accurate. 2022 U.S. Dist. LEXIS 146750,

---

[3] At minimum, questions of fact remain concerning the credibility of Mr. Holmes, whose testimony contradicts his email correspondence and representations to Ms. Frazier concerning the erroneous reporting. If nothing about the credit reports were misleading, and Mr. Holmes believed the late payments had no impact, why did he advise Frazier that these lates were a problem in his email? MFB_0000501. Why did he confirm that these lates would cause a decline under the FHA guidelines? Holmes Dep., p. 55:9-12.

*4 (N.D. Ill. Aug. 17, 2022). Because Frazier's mortgage was 90 days late at the time it was closed, Judge Feinerman concluded that it was proper for DMI to report the Pay Rate code of "3" in the payment status. *Id*. But Judge Feinerman's decision was limited to DMI's ACDV correspondence, and never addressed the credit report issued by Equifax. *Id*.[4] No opinion was rendered on the issue of whether it is permissible for Equifax to report Frazier with the Erroneous 2018-2020 Lates, i.e. the information reported in the Account History Grid.[5] *Id*. Accordingly, Judge Feinerman's decision never touched on the issues presented here, and he certainly never ruled that Equifax's reporting Frazier as late after 2016 was accurate.

Equifax's comparison of Frazier's claims to *Bibbs*, *Gross*, and *McAlistor* ("BGM") are also inaccurate because it relies on Equifax's reframing of Frazier's allegations. In each of these cases the issue presented was whether the credit entry was inaccurately reporting as *currently* late. Each of these cases rested on a single theory that the "Pay Status" notations indicated the consumer was *currently* late. *Bibbs*, 43 F.4th at 338; *Gross v. Private Nat' Mortg. Acceptance Co., LLC*, 512 F. Supp. 3d 423, 425 (E.D.N.Y. 2021).

Frazier's theory of liability in this case does not rest on the "Pay Status" and is not concerned with whether the loan is reporting as *currently* late. Frazier's cause of action and her damages stems from the report pulled by her mortgage broker in Exhibit 2 Frazier's focus is on that report, and Erroneous 2018-2020 Lates. The Pay Status is not present on that tradeline. It is only Frazier's dispute investigation results that show the Pay Status data field addressed in each

---

[4] The oral argument transcript provides greater insight into the ruling issued there. First, Judge Feinerman implied that either Equifax or DMI should be liable for the error, but not both. Exhibit 11, P. 7:18-20. Along this theory, because DMI was found not liable, it stands to reason Judge Feinerman believed Equifax bore the burden of liability for the error. Second, DMI made clear to Judge Feinerman that the credit report that contained the error was issued by Equifax, and DMI does not have control over what Equifax reports. *Id*. at 10:8-11:4. Instead, DMI only controls what is on the ACDV forms, and it was this form that Judge Feinerman focused on while deciding DMI's liability. (The credit report does not contain code a data field for Pay rate "3" 2022 U.S. Dist. LEXIS 146750, at *4).
[5] *See* Plaintiff's Exhibit 5, DMI001514-15. This ACDV has the Pay Rate of "3" highlighted in yellow and the Account History field outlined in red.

of *Bibbs*, *Gross*, and *McAlistor* ("BGM").[6] Although not relevant to the current litigation, Image 2, which shows Ms. Frazier's dispute results is illustrative in explaining the distinction between this case and BGM.

Image 2. Exhibit 19.

Issue raised
By BGM





Issue raised by Frazier

As is seen above, Frazier's complaint is not that the Pay Status of 90-119 Days Past Due is making Frazier appear as *currently* late. The issue is that Frazier's mortgage was declined because she appeared to have been late on her mortgage within 12 months prior to the application. (Plaintiff's application was in September 2020, but her Equifax report was showing a late payment July 2020, November 2019, and October 2019 etc., *see* EQX – 1841 (Def. Exhibit V and Plaintiff's Ex. 2). Thus, this case is materially different than each of *Bibbs*, *Gross*, *McAlistor*. In those cases, the Pay Status field was argued to represent *currently* past due, but the

---

[6] Each of *Bibbs*, *Gross*, and *McAlistor* were focused solely on the Pay Status field. *See Bibbs*, at 342 ("Are their credit reporting containing the Pay Status notations misleading or inaccurate?") (Exhibit 12); *Gross*, 512 F. Supp. 3d at 425 ("In short, says plaintiff, the 'Pay Status' entry is 'false and misleading' . . . .") (Exhibit 13); *McAlister v. Equifax Info. Servs., LLC*, Case. No. 1:22-cv-50 (S.D.Ind. Aug. 29, 2022) (Def. Exhibit DD). Equifax also compares this case to *Connor v. JP Morgan Chase Bank, N.A.*, 2016 U.S. Dist. LEXIS 66976, at *3 (N.D.Ill. Mar. 22, 2016). But that case addresses a "Scheduled Payment Amount and Actual Payment Amount." This does not relate to inaccurate historical lates.

report did not list any "verbs such as 'is' or 'was'". *Bibbs*, at 343. Here however, the reporting clearly and inaccurately lists Frazier as late during each of the Erroneous 2018-2020 Lates.

**B. Frazier Suffered Financial and Emotional Damages From Equifax's Reporting**

1. <u>Financial Damages</u>

A plaintiff "must produce evidence from which a reasonable trier of fact could infer that the inaccuracy in her credit report was a substantial factor that brought about damages." *Ruffin-Thompkins v. Experian Info. Sys., Inc*., 2003 U.S. Dist. LEXIS 23647, at *16 (N.D. Ill. Dec. 31, 2003), *aff'd*, 422 F.3d 603 (7th Cir. 2005); *Taylor v. Screening Reports, Inc*., 2015 U.S. Dist. LEXIS 86262, at *20 (N.D. Ill. July 2, 2015). A plaintiff need not eliminate the possibility that "correct adverse entries or any other factors," also entered into the decision to deny credit. *Philbin v. Trans Union Corp*., 101 F.3d 957, 969 (3d Cir. 1996); *Cahlin v. General Motors Acceptance Corp*., 936 F.2d 1151, 1161 (11th Cir. 1991); *Stewart v. Credit Bureau, Inc*., 734 F.2d 47, 54 (D.C.C. 1984) ("[A] trier of fact could reasonably conclude that [defendant] denied [plaintiff] membership <u>at least in part</u> because of the adverse credit report, and summary judgment was inappropriate.") (emphasis added); *see also* PROSSER & KEETON § 41, at 268 ("If the defendant's conduct was a substantial factor in causing the plaintiff's injury, it follows that he will not be absolved from liability merely because other causes have contributed to the result . . . .").

The inaccurate DMI lates were a substantial factor that led to Frazier's credit denial. During the mortgage approval process, mortgage brokers work hand in hand with the consumer to choose the best loan option and to advise the consumer what issues need to be addressed to ensure that they meet the eligibility criteria.[7] After consultation with Mr. Holmes, Frazier was

---

[7] Mr. Holmes's email advised Frazier of two issues that she needed to take care of for her mortgage to be approved. MFB_0000501. *See also* Holmes Depo., 58:19-24. Similarly, Mr. King testified that debt reduction would be

advised to proceed with an FHA mortgage. Holmes Dep., 33:11-19. FHA mortgage approval can go through two distinct processes: automated underwriting and manual underwriting. Holmes Dep., 15:10-17:18; King Report, at 2. These different processes allow for different underwriting criteria. Holmes Dep., 16:13-17:9; King Report, at 2. One example of this difference is the debt ratio allowed. Automated underwriting allows for a greater debt ratio of 56.999%; manual underwriting allows a maximum ratio of 50%. King Report, at 2. There is no dispute that Frazier's application did not qualify for automated underwriting. Holmes Dep., 27:23-28:6; King Report, at 3.

There is no genuine dispute of material fact as to why Frazier's credit application was downgraded from automated to manual. Per the FHA guidelines, any FHA mortgage application must be downgraded from automated to manual underwriting whenever a credit report reflects that, within the last twelve months, any mortgage had a single late payment greater than 90 days late. King Report, at 2 (citing HUD Single Family Housing Policy Handbook 4000.1). Mr. King opined that the DMI tradeline, which had 3 separate 90-day late remarks within the last twelve months, and an additional 3 in the latter 24 months, caused Frazier's mortgage to be downgraded to a manual underwrite. *Id.* at 2-4.[8] Mr. Holmes also confirmed as much.[9] Holmes Depo., at 57:18-58:9.

Frazier's required downgrade into automated underwriting was a substantial factor in her loan denial. At the time Frazier was expecting to close her mortgage, her Debt Ratio was

---

something a typical broker would advise the client on in closing the loan. King Dep., p. 75:10-16 (the difference in debt to income ratio "was roughly $1800 of indebtedness; and that's a very small gap; and generally, there would be a way to do that debt reduction to fall within the acceptable parameters.").

[8] King also confirmed that numerous late payments on a mortgage payment within the last 24 months not only results in a downgrade, but also an outright denial under the FHA guidelines even in the manual underwriting.

[9] Holmes also mentioned a separate causal factor for the loan being put into manual underwriting, the existence of "dispute notations." Even if both issues caused this, DMI remains a substantial factor, which meets the test for damages. *Taylor*, 2015 U.S. Dist. LEXIS 86262, at *20. Further, Mr. King testified that the dispute notations do not typically hold up a mortgage. King Dep., p. 47:8-11 (Disputes "may not have been a problem had the credit reporting been accurate.").

57.986%. This ratio was in striking distance (less than 1%) of the approval criteria for automated underwriting. Mr. King opined that Frazier needed to pay off $1,800-$2,500 of debt to meet the necessary criteria for automated underwriting. Mr. King also explained how the loan process works: mortgage brokers work with consumer borrowers to identify any eligibility issues and correct them. King Dep., p. 74:4-76:9. Mr. King opined that it is "common practice" to resolve small percentages such as Ms. Frazier's over the eligibility requirements, and that such small amounts "simply do not stop loans under these circumstances." King Dep., p. 75:10-16; King Report, at 4. This lead Mr. King to opine that "it is my opinion that the account at issue in this case is being reported inaccurately (the DMI late payments within 12 and 24 months of the loan application), and this played a significant factor in preventing Frazier from proceeding with her mortgage, if not the only factor." King Report, at 4.

Equifax argues that the loan was denied because of Frazier's Debt Ratio. Frazier does not dispute this fact. However, the Debt Ratio required for eligibility was drastically limited because of the DMI account. Unsurprisingly, Equifax fails to present any counter evidence that Frazier's loan was subject to manual underwriting, and a more limited Debt Ratio, as a direct result of the DMI late errors. Accordingly, because the facts must be taken in favor of the non-movant, Equifax has failed to establish its burden of proof, as questions of fact clearly remain.

Instead of evidence however, Equifax seeks to paint King's unrebutted opinion as merely speculation. But Mr. King's expert testimony is based on his years of experience in the field of underwriting loans. His experience, applied to the facts of this case, establish the basis for his testimony that the late payments were an obstacle to Plaintiff's loan. *See Vollmert v. Wis. DOT*, 197 F.3d 293, 298 (7th Cir. 1999) ("For an expert report to create a genuine issue of fact, it must provide not merely the conclusions, but the basis for the conclusions."). His opinion is even

12

supported by the brokers testimony, as Mr. Holmes' email also details how the payments were an obstacle. Equifax offers no rebuttal expert and Mr. Holmes does not contradict that the late payments caused Plaintiff's loan to be manually reviewed. Holmes Dep., p. 52:6-21. As such, testimony from an expert in the industry confirms what Mr. Holmes testified to: the Erroneous 2018-2020 Lates were a hindrance to an automatic underwriting of her loan. Reliance on evidence and industry experience is a far cry from speculation. At the very least, where "there is a material dispute as to the credibility and weight that should be afforded to conflicting expert reports, summary judgment is usually inappropriate." *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011). Here, there is only one, uncontroverted expert report. Thus, summary judgment on the issue of actual damages should be denied because there is at least a question of fact regarding the issue.

2. <u>Emotional Damages</u>

Emotional damages are recoverable even without a credit denial. *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) ("no case has held that a denial of credit is a prerequisite to recovery under the FCRA"). Actual damages under the FCRA for emotional distress damages may include a party's own testimony <u>so long as the plaintiff has reasonably and sufficiently explained the circumstances of the injury.</u> *Ruffin-Thompkins*, 422 F.3d at 609 ( (*citing Sarver v. Experian Info. Sols.*, 390 F.3d 969, 971 (7th Cir. 2004)). In *Allen v. Experian Info. Solutions, Inc.*, 2006 U.S. Dist. LEXIS 29049, at *4 (S.D.Ill. May 12, 2006), the plaintiff demonstrated extreme emotional distress, including loss of sleep, headaches, a nervous stomach, "and various other difficulties." The Court held that "Plaintiff's affidavit details specific physical and emotional harm caused by the problems he experienced" and that his "wife's affidavit further details specific emotional problems of plaintiff she observed and

13

believes were directly related to plaintiff's frustration resulting from his inability to have defendants remove the erroneous account from his credit report." *Id*. at *9-10. This was enough to satisfy the higher requirements of the Seventh Circuit to pursue claims for emotional damages. *Id*.; *see also Paz v. Portfolio Recovery Assocs., LLC*, 2016 U.S. Dist. LEXIS 50149, at*13-14 (N.D. Ill. Apr. 14, 2016) (testimony of "feeling helplessness, confusion, anxiety, feeling 'sick to [his] stomach,' nervousness, inability to sleep, worry and fear of losing his job due to the . . . tradeline, and stomach tightness" sufficient.). Here, similar facts giving rise to Plaintiff's emotional injury lay the context which led Ms. Frazier to the injury.

There is no genuine dispute of material fact that a substantial factor of Ms. Frazier's emotional distress was caused directly by Equifax's reporting of the DMI tradeline. There is no question that Mr. Holmes specifically told Ms. Frazier that the late payments were causing her issues with getting the mortgage. MFB_501; Frazier Dep., p. 16:13-18. Holmes never mentioned anything to Frazier about the Debt Ratio. Frazier Dep., p. 18:7-11 ("he stated I had to get the late payments fixed, I had to contact Equifax and try to get that fixed in order to be approved.") Frazier Dec., ¶ 6 (Plaintiff's Exhibit 9). Thus, it is clear that Frazier was led to believe that her inability to purchase her home was solely tied to the DMI lates.

The background of why Frazier was purchasing the home in question is relevant to understand the emotional injury. Ms. Frazier was going to be purchasing the house for her sick mother who otherwise would be homeless. Frazier Dep., p. 14:21-15:23. This explains why Ms. Frazier "exhaust[ed] all avenues" to fix the DMI reporting error, and her failure to do so caused her to become extremely frustrated, and discontinue the mortgage application. MFB_0000507; MFB_0000511 (Pl. Ex. 7) (Bank's documentation of Frazier's frustration with creditor). Plaintiff described her emotional damages vividly, with sufficient detail to warrant a jury's determination:

[I]t's just pain, humiliation from being denied that loan. At that time it was a very stressful time. I'm worried about my mother, she's going to be homeless. She has stress, her blood pressure is up, my blood pressure is up, not being able to be that person to help her. At that time just – it was just awful, humiliating, and it was a lot of sleepless nights, feeling helpless and hopeless that I couldn't do anything. Just headaches, stress headaches all the time, just staying in the house, being by myself because I felt like I wasn't getting any help, you know, the late payments weren't being corrected and it was a[n] obvious mistake or obvious error I should say, just feeling nauseous in the stomach. It was a nightmare of a time, and no one should have to have their mother homeless, you know.

Frazier Dep., p. 99:8-24.

Ms. Frazier further expounded upon her damages within her declaration. There, Ms. Frazier detailed the frequency, length of time, and persistence within which she suffered from anxiety, loss of sleep, and headaches. Frazier Dec., ¶¶ 9-14.

Equifax has failed to rebut the existence of emotional distress damages. Not only did Frazier explicitly define her stress, isolation, and frustration, but there is corroborating evidence from Plaintiff's mother. *See* Declaration of Vivian Davis, Plaintiff's Exhibit 10; Plaintiff's Interrogatory Response Nos. 7, 10, and 17 (Def. Ex. W). Equifax's second argument is that the emotional distress arose from the Debt Ratio, not the inaccurate lates. But King explained how the late payments impacted the Debt Ratio. Further, Ms. Frazier's emotional distress came only from what Mr. Holmes conveyed to her. And Ms. Frazier provided clear testimony that Holmes told her it was the inaccurate lates that was preventing the loan from proceeding. Frazier Dep. 16:8-18:11. Thus, because Ms. Frazier was led to believe that it was the inaccurate lates, she did everything she could to fix them, and when she was unsuccessful the emotional distress arose because of those lates. Accordingly, questions of fact remain, and Plaintiff meets the necessary standard.

### C. Defendant Fails to Carry Its Burden on the Reasonableness of its Investigation[10]

"[T]he determination of the reasonableness of [a] defendant's procedures . . . is treated as a factual question even when the underlying facts are undisputed. It therefore cannot be resolved on summary judgment unless the reasonableness . . . of the procedures is beyond question. . . ." *Hinton*, 2005 U.S. Dist. LEXIS 6275, at \*17 (*citing Crabill v. Trans Union*, 259 F.3d 662, 664 (7th Cir. 2001)). Questions of fact clearly remain concerning the reasonableness of Defendant's investigation because: 1) Equifax knew the reporting was erroneous, 2) DMI alerted Equifax to change the reporting error which Equifax ignored, and 3) Plaintiff's disputes repeatedly advised Defendant that it was inaccurately reporting the account.[11]

The Seventh Circuit has laid out two corollary principles for reinvestigation claims under the FCRA. These principles are succinctly described by another circuit:

> Our sister circuits have laid out two corollary principles. First, a reporting agency's procedures will not be deemed unreasonable unless the agency has a reason to believe that the information supplied to it by a data furnisher is unreliable. *See Sarver v. Experian Info. Sols.*, 390 F.3d 969, 972 (7th Cir. 2004). Because "lenders report many millions of accounts to Experian daily," requiring it to examine each report individually for errors would be unduly costly. *Id*. But on the flip side of the same coin, when a "credit reporting agency . . . has been notified of potentially inaccurate information in a consumer's credit report[,] [it] is in a very different position than one who has no such notice." *Henson v. CSC Credit Servs.*, 29 F.3d 280, 286-87 (7th Cir. 1994). That's because "once a claimed inaccuracy is pinpointed, a consumer reporting agency conducting further investigation incurs only the cost of reinvestigating that one piece of disputed information." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

*Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 945 (11th Cir. 2021).

---

[10] It remains unclear why Equifax raised issue with who sent the letters in a footnote. Ms. Frazier clearly testified that she personally signed the letters and mailed them. Frazier Dep., p. 48:20-22 ("I wrote the letter, printed it, mailed it and sent it to Equifax."); 75:20-21. The FCRA does not preclude a consumer from obtaining assistance in drafting a letter.

[11] The reasonableness of the investigation is only at issue for Plaintiff's § 1681i claim. Plaintiff's § 1681e(b) claim survives even if the Court were to find the "investigation" reasonable.

Equifax's investigation cannot be considered reasonable as a matter of law under *Sarver* or *Henson*.

1. Equifax Knew the Reporting was Erroneous

As early as April 3, 2018, Equifax knew that Ms. Frazier satisfied all outstanding obligations to DMI on the loan at issue, and that the account had been closed. Willis Dep., p. 42: 24-43:20. Therefore, Equifax knew or should have known that it could not report Ms. Frazier as 90 days past due for any months after April 2018. Yet, Equifax reported her as late, by 90 days, on each of December 2018, January, June, August, October, November 2019, and July 2020 nonetheless. When repeatedly pressed on whether there could possibly be a situation where a mortgage account can be properly marked as late years *after* the account was paid in full, Equifax could not explain how such a thing could be reported by the data furnisher in the first instance. *Id.* 53:17-22. In fact, Equifax now acknowledges that this type of reporting is so illogical, it has instituted a new policy or rule that specifically states "late payments should not report after the close date." Willis Dep., p. 179:23-180:10. Equifax admits that the current reporting is in contrast to that rule. Willis Dep., p. 181:13-18. Accordingly, because Equifax knew or should have known that reporting Frazier as late 2, 3, and 4 years after the account was satisfied and closed, any investigation that resulted in Equifax verifying information it absolutely knew to be inaccurate cannot be considered reasonable as a matter of law. See Hendricks' Report, p. 1 and 4 ("At this time however, Equifax knew that Frazier could not be late past 2016, or at least 2018.").[12]

---

[12] Although Defendant did not address Plaintiff's § 1681e(b) claim under reasonableness, these same arguments apply under that section. If Equifax knew the information was illogical and inaccurate, and could (as it did) create a procedure to ensure greater accuracy, then the prior procedures were not reasonable to ensure maximum possible accuracy. Even so, if the Court finds that Defendant's investigation was reasonable, the § 1681e(b) survives.

For these reasons, even prior to the disputes, Equifax's reliance on *Sarver* is misplaced because Equifax had reason to believe that the information supplied to it by DMI (or willfully misinterpreted by Equifax)[13] was unreliable.

2. DMI Alerted Equifax To Remove the Erroneous Lates; Equifax Disregarded DMI

Equifax argues that it satisfied its FCRA obligations by "sending Plaintiff's disputes to DMI," and verifying whatever DMI confirmed to Equifax. Problematically however, DMI did not instruct Equifax to report the Erroneous 2018-2020 Lates; to the contrary, DMI testified that it told Equifax to remove these erroneous lates.

The erroneous reporting was caused solely by Equifax. Fagan Dep., p. 96:17-18 ("We stopped reporting on this loan after it closed"); 104:2-8 (in "January of 2016"). The error at issue arose through misapplication of DMI data. Specifically, after the account was closed, DMI reported to Equifax that the account should reflect a status of "13" with a Payment Rating of "3".[14] Nonetheless, Equifax actively ignores code "13" and focuses instead at the payment rating "3". Willis Dep, p. 125:16-126:7; 156:7-9 ("we do see that the [13] code that [DMI is] providing is a different code than what was currently reporting."). This causes the tradeline to appear on Equifax reports as though the consumer is 90 days late within the "account history" information grid for each of the months that DMI provides this payment rating in response to Plaintiff's disputes. *Id.* at 127:24-132:2; 137:5-140:14. When a future dispute comes in, the pay rate of "3" is shown as a monthly historical late by Equifax. *Id.*; Hendricks Dep., p. 97:25-98:4 ("when plaintiff sent in a dispute of the DMI tradeline, that would cause a 90-day late to go into the payment history in response to the dispute.").

---

[13] *See infra*, Section C.2.
[14] Code "13" means account closed. Fagan Dep., 81:20-21. Payment Rating "3" means 90 days past due. *Id.* 91:20-92:15. Whether DMI's simultaneous reporting of account status code "13", with payment rating code "3" is proper, is not at issue in this litigation.

After forwarding Frazier's disputes to DMI, DMI attempted to alert Equifax that the Erroneous 2018-2020 Lates should be removed. Specifically, DMI input a "dash" in the monthly payment history section, instead of confirming the "3" to indicate no reporting within any months after January 2016. Fagan Dep., p. 85:7-22 92:6-94:22; 130:9-11. However, Equifax chose to interpret the dash as an asterisk, which Equifax interprets as an invalid reporting symbol.[15] Willis Dep., p. 151:1-21. In fact, DMI made it clear that it "continue[d] to reiterate an attempt to correct" the erroneous lates after the closed date in 2015 by placing a "dash" within each of DMI's ACDV's <u>so that Equifax would stop reporting Ms. Frazier as late during these months</u>. *Id.* at 94:19-22. *See* DMI 1515 (July 2020 Dispute); DMI 1513 (September 9, 2020 Dispute); DMI 1507 (September 25, 2020 Dispute) Exhibits 5, 6, and 8. As such, Equifax, and Equifax alone, kept the monthly payment status as a "3," or 90 days past due, for those specific months listed in the historical payment grid. Willis Dep., p. 99:14-19.[16]

Given DMI's testimony that it never told Equifax to report Frazier as late after January 2016, and that it explicitly told Equifax to remove any lates reporting after that within each of their ACDV's, Equifax's defense makes little sense. Equifax cannot escape liability by placing the sole responsibility on the furnisher, and then not listening to what it is told by the furnisher. Equifax cannot rely on *Sarver*; questions of fact remain.

3. <u>Equifax's Sole Reliance on the ACDV Exchange Was Not Reasonable</u>

Because Frazier provided at least two clear disputes to Equifax that the lates after short sale were erroneous, it was in "very different position" and was no longer able to rely solely on

---

[15] Again, concerning Plaintiff's § 1681e(b) claim it cannot be considered a reasonable procedure to ensure maximum possible accuracy to disregard information from a furnisher and reach a different heretofore unexplained interpretation, and then declare that interpretation the definition of maximum possible accuracy.

[16] Thus, while Equifax argues that DMI verified the inaccuracies, Equifax, in deposition, admitted that DMI *did not* simply verify the inaccuracies. Equifax's disregard for DMI's response is another factual issue preventing a finding of reasonableness as a matter of law. *See* Hendricks Report, p. 4 (articulating how Equifax's disregard for DMI's response shows their investigation was unreasonable). Whether DMI should have used the "dash" in light of Equifax's testimony is not at issue in this case.

the belief that DMI was a reliable furnisher. This case *requires* application of the second corollary under binding Seventh Circuit law in *Henson*, 29 F.3d at 286-87. Indeed, the Circuit case law is unanimous, that where the CRA is sufficiently advised of the error by the consumer, the CRA's sole action of sending an ACDV to the furnisher cannot be found sufficient as a matter of law. *Collins v. Experian Information Solutions, Inc.*, 775 F.3d 1330 (11th Cir. 2015); *Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986); *Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1068-69 (9th Cir. 2008); *Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982); *Cushman*, 115 F.3d at 224-25.

A "credit reporting agency may be required, in certain circumstances, to verify the accuracy of its initial source of information." *Henson*, 29 F.3d at 286-87. "Whether the credit reporting agency has a duty to go beyond the original source will depend, in part, on whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable or the reporting agency itself knows or should know that the source is unreliable. The credit reporting agency's duty will also depend on the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer." *Id*. The Circuit provided further instruction for a claim under § 1681i: if the consumer shows that they brought the error to the credit agencies' attention, the trier of fact **must** weigh the various factors of reasonableness. *Id*. (Emphasis added).

*Losch* also sets a brightline rule for an FCRA reasonableness analysis after analyzing the Seventh Circuit case law: "where (1) Losch provided a sufficiently detailed notice to Experian for it to investigate the inaccuracy and (2) Experian did nothing other than forward the letter to its data furnisher—we cannot say that Experian's procedures were reasonable as a matter of law, such that it was entitled to summary judgment." 995 F.3d at 947.

20

Equifax's investigation cannot be considered reasonable as a matter of law. Frazier submitted two disputes concerning the erroneous late payments. EIS 1440 and 1833 (Def. Ex. P and T). Each dispute was sufficiently detailed to put Equifax on notice that something was obviously wrong. Further, Equifax knew the reporting was an impossibility. Willis Dep., p. 42: 24-43:20. Nonetheless, Equifax did nothing other than forward the letter to its data furnisher. Willis Dep., p. 171:10-20. Even further, despite DMI's attempts to correct the error, Equifax disregarded these attempts. Hendricks report, p. 4. Moreover, while Equifax knew that its system did not know how to handle the "dash" it received from DMI, the reasonable action to take (at minimal cost) would have been to communicate with DMI. Instead, Equifax made up its own interpretation of the data, and did not conduct any investigation.[17] Alternatively, assuming Equifax did not disregard the data from DMI, but somehow believed DMI was verifying the data, Equifax was put on sufficient notice that DMI was not a reliable data furnisher, because, as Equifax already knows, it was impossible for Frazier to have been reported as late in 2018-2020 when the account was satisfied in full and closed in 2016. Further, Equifax also knew DMI was unreliable because Equifax knew that DMI was not following the CRRG. Willis Dep. 130:14-131-24 (furnishers must follow the CRRG); 152:7-21 (furnishers should not report a "dash"); 98:23-99:24 (Equifax disregarded DMI's "invalid code.").

Yet another reason Equifax cannot prevail as a matter of law, is that Equifax fails to present any evidence that establishes that DMI can be considered a reliable furnisher by Equifax in the first instance. *Contra Chaitoff v. Experian Info. Sols., Inc.*, 2021 U.S. Dist. LEXIS 90281, at *14 (N.D. Ill. May 12, 2021) (Experian established furnisher considered a reliable source by

---

[17] It is no surprise that Equifax failed to correct the contradiction. Problematically, "Equifax's operation of the ACDV-exchange . . . operates in a conveyor-belt styled atmosphere in which predominantly overseas dispute operators are under pressure to process disputes quickly and to meet production quotas, so much so that, as was the case here, they ignore the substance of the actual dispute." Hendricks Report, p. 3.

proving that it engaged in a "stringent vetting process"). Because Equifax has presented no evidence that it is entitled to rely on DMI in the first instance, it cannot rely on *Collins v. Diversified Consultants Inc.*, 2017 U.S. Dist. LEXIS 35487 (D. Colo. Feb. 1, 2017) or *Sarver*. Applying the proper summary judgment standard, the facts must be taken in the light favorable to the non-movant. Here, Ms. Frazier has presented evidence establishing that Equifax could not rely on DMI because it knew the information to be wrong, and it knew of DMI's non-compliance with Equifax's own reporting rules. Thus, the ACDV investigation alone was insufficient and unreasonable and numerous questions of fact remain on the issue of whether Equifax's investigation was reasonable.

### D.  Questions of Fact Remain on the Issue of Willful Violation of the FCRA[18]

To find a willful violation, Frazier must present enough facts to demonstrate that Equifax's conduct ran a risk of violating the law "substantially greater" than the risk associated with mere carelessness. *Folkerts v. Seterus, Inc*., 2019 U.S. Dist. LEXIS 42347, at *44 (N.D. Ill. Mar. 15, 2019). Evidence demonstrating a conscious disregard for accuracy is sufficient to create genuine issues of material fact precluding summary judgment. *Id*. In *Folkerts*, the consumer's home loan was discharged in bankruptcy. *Id*. at *3. There was no dispute that the defendant loan servicer was on notice that the loan was discharged. Nonetheless, the defendant loan servicer reported the loan as delinquent and past due. *Id*. at *12. The defendant received two disputes from Equifax and Experian, but the errors remained. *Id*. Addressing willfulness, the Court concluded that because the Defendant's own internal records showed that the loan had been discharged, a "reasonable jury could infer that, after looking at correspondence clearly indicating

---

[18] Even if the Court were to find no actual damages, Frazier may pursue statutory damages. *Persinger v. Sw. Credit Sys., L.P*., 20 F.4th 1184, 1194-95 (7th Cir. 2021).

the discharged status of the debt, it would have taken "willful disregard" of that information for Defendant to fail to correct Plaintiffs' credit report." *Id*. at *45.

This case presents numerous bases from which a jury could conclude that Equifax consciously disregarded credit reporting accuracy. First, as in *Folkerts*, there is no dispute that Equifax's own internal system had sufficient information to conclude that the loan was satisfied in full in 2016. Willis Dep., p. 42:24-43:11; Hendricks Report, p. 1, 4. Further, Equifax knows that there is no circumstance that a loan can be considered late years after it is settled and closed. Willis Dep., p. 52:10-53:22. Nonetheless, Equifax knowingly reported Frazier as late in 2018, 2019, *and* 2020. A reasonable jury could therefore infer that after looking at Equifax's internal records, or applying common sense, it would have taken a "willful disregard" of that information for Equifax to fail to correct Frazier's credit report.

Second, the errors at issue in this case did not arise from DMI, but from Equifax itself. *Supra* Section C.2. Third, in response to numerous ACDV's from DMI, DMI provided a "dash" in order to alert Equifax to remove the erroneous late. DMI 1515; DMI 1513; DMI 1507; *supra* Section C.2. Equifax recognized that DMI was providing a "dash," and Equifax also knew that the "dash" is not a data field that it recognizes as per the Credit Reporting Resources Guide "CRRG". *Supra* Section C.2. Despite knowing that DMI was providing a data field that was not permitted by the CRRG, Equifax *did not* contact DMI to ascertain what DMI was informing Equifax concerning the months at issue and continued to consider DMI reliable furnisher despite violating its own reporting rules. Willis Dep., p. 171:3-15. Instead, Equifax intentionally misinterpreted DMI's "dash" to mean something else entirely—verification of the late payments. *Supra* Section C.2. Equifax's (repeated) failure to seek clarity on a data point that it knew it did not understand demonstrates a reckless disregard and a real risk of violating the law substantially

23

greater than the risk associated with mere carelessness. In fact, after Equifax received the response from DMI with a coding that it did not understand, Equifax had a second opportunity to cross reference the information with that in its own files—i.e. that the account was paid and closed since 2016. But Equifax recklessly failed to do this. Fourth, Equifax was put on notice of the error from Frazier repeatedly, and also put on notice of correction attempts from DMI repeatedly. *See Am. Arms Int'l v. Herbert*, 563 F.3d 78, 85 (4th Cir. 2009) (A defendant may demonstrate reckless disregard by repeatedly ignoring warning signs that it is violating the law and by failing to take corrective action to prevent future violations.)

Finally, Equifax's sole reliance on the ACDV procedure, in contrast to Circuit law, creates genuine issues of material fact. Given Equifax's willful misinterpretation of DMI's correspondence, Equifax was effectively put on notice that DMI was not a reliable furnisher. After all, given that Equifax knew that loan was paid and closed in 2016 and that it does not make sense to report lates after a loan is closed and satisfied, Equifax nonetheless interpreted DMI's transmission as verifying obviously inaccurate lates in 2018-2020. At this point, under Circuit Court guidance in *Henson*, *Collins*, *Pinner*, *Bryant*, or *Cushman*, Equifax was no longer allowed to rely solely on the ACDV. Yet, that is exactly what Equifax did. Willis Dep., p. 171:10-20.

Equifax's "parroting" of information in this case, or merely copying the information on the ACDV, is "not a reinvestigation into whether or not the furnisher's reporting is inaccurate," and is "particularly unreasonable in a case like Plaintiff's because her disputes advised" Equifax as to the specific problem. Hendricks report, p. 3. This "meant that Equifax disregarded various forms of robust notice that its reinvestigation [] in general, and parroting in particular, were inadequate to assure adequate reinvestigations and to restore accuracy to the files of disputing

24

consumers." Hendricks report, p. 4. Mr. Hendricks relates that this is a "consistent problem" with Equifax, who has been on notice in several past cases that its policies were inadequate under the law. Hendricks report, p. 5-6.

Equifax erroneously relies on *Sarver* to avoid a willful finding arguing it "correctly reports information supplied by furnishers like DMI." Def. Memo [ECF 53], p. 14. But this is incorrect. Equifax did not correctly report information from DMI. To the contrary, DMI testified that it never told Equifax to report Frazier as late after December 2015. It cannot be that Equifax can avoid liability for willfulness, when it *misreports* information it receives from data furnishers—this would place the statute on its head. For each of these reasons, Equifax's motion concerning willfulness must be denied.

## V. CONCLUSION

Whether Defendant reported inaccurate information and whether Defendant's investigation was reasonable remain questions of fact for a jury. Plaintiff has provided sufficient evidence, through credit reports, Plaintiff's mortgage denial, two expert reports, and case law, that a jury could reasonably find that the report was inaccurate or misleading. Further, the jury has no less than five reasons for a jury to conclude that Equifax's investigation was not reasonable, and willfully so. For these reasons, summary judgment must be denied.

Respectfully submitted,

/s/Daniel Zemel
Daniel Zemel, Esq.
Zemel Law LLC
660 Broadway
Paterson, New Jersey 07514
T: 862-227-3106
dz@zemellawllc.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of November, 2022, the foregoing was served on all counsel of record via the court's ECF system.

<u>/s/Daniel Zemel</u>
Daniel Zemel, Esq.

26